# FARMER, SPECIAL ADMININISTRATOR *v.* UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, LOCAL 25, ET AL.

No. 75–804.   Argued November 8, 1976—Decided March 7, 1977

PoWELL, J., delivered the opinion for a unanimous Court.

*G. Dana Hobart* argued the cause and filed briefs for petitioner.

*Leo Geffner* argued the cause for respondents. With him on the brief was *George Kaufmann.*

*Norton J. Come* argued the cause for the National Labor Relations Board as *amicus curiae* urging affirmance. With

him on the brief were *Solicitor General Bork, John S. Irving, Carl L. Taylor,* and *Linda Sher.**

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is whether the National Labor Relations Act, as amended, pre-empts a tort action brought in state court by a Union member against the Union and its officials to recover damages for the intentional infliction of emotional distress.

I

Petitioner Richard T. Hill[1] was a carpenter and a member of Local 25 of the United Brotherhood of Carpenters and Joiners of America. Local 25 (Union) operates an exclusive hiring hall for employment referral of carpenters in the Los Angeles area. In 1965, Hill was elected to a three-year term as vice president of the Union. Shortly thereafter sharp disagreement developed between Hill and the Union Business Agent, Earl Daley, and other Union officials over various internal Union policies. According to Hill, the Union then began to discriminate against him in referrals to employers, prompting him to complain about the hiring hall operation within the Union and to the District Council and the International Union. Hill claims that as a result of these complaints he was subjected to a campaign of personal abuse and harassment in addition to continued discrimination in referrals from the hiring hall.[2]

---

*\*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] Hill died after the petition for a writ of certiorari was granted. On June 1, 1976, Joy A. Farmer, special administrator of Hill's estate, was substituted as petitioner. We will refer to Hill as the petitioner.

[2] According to Hill, the Union accomplished this discrimination by removing his name from the top of the out-of-work list and placing it at the bottom, by referring him to jobs of short duration when more desirable work was available, and by referring him to jobs for which he was not qualified.

In April 1969 petitioner filed in Superior Court for the County of Los Angeles an action for damages against the Union, the District Council and the International with which the Union was affiliated, and certain officials of the Union, including Business Agent Daley. In count two of his amended complaint, Hill alleged that the defendants had intentionally engaged in outrageous conduct, threats, and intimidation, and had thereby caused him to suffer grievous emotional distress resulting in bodily injury. In three other counts, he alleged that the Union had discriminated against him in referrals for employment because of his dissident intra-Union political activities, that the Union had breached the hiring hall provisions of the collective-bargaining agreement between it and a contractors association by failing to refer him on a nondiscriminatory basis, and that the failure to comply with the collective-bargaining agreement also constituted a breach of his membership contract with the Union. He sought $500,000 in actual, and $500,000 in punitive, damages.

The Superior Court sustained a demurrer to the allegations of discrimination and breach of contract on the ground that federal law pre-empted state jurisdiction over them, but allowed the case to go to trial on the allegations in count two.[3] Hill attempted to prove that the Union's campaign against him included "frequent public ridicule," "incessant verbal abuse," and refusals to refer him to jobs in accordance with the rules of the hiring hall. The defendants countered with evidence that the hiring hall was operated in a nondiscriminatory manner. The trial court instructed the jury that in order to recover damages Hill had to prove by a preponderance of the evidence that the defendants

---

[3] Hill did not appeal the Superior Court's ruling sustaining the demurrer with respect to the claims of discrimination and breach of contract, and we thus have no occasion to consider the applicability of the pre-emption doctrine to those counts.

intentionally and by outrageous conduct had caused him to suffer severe emotional distress. The court defined severe emotional distress as "any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worr[y]." The injury had to be "severe," which in this context meant

> "substantial or enduring, as distinguished from trivial or transitory. It must be of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it. Liability does not extend to mere insults, indignities, annoyances, petty or other trivialities."

The court also instructed that the National Labor Relations Board would not have jurisdiction to compensate petitioner for injuries such as emotional distress, pain and suffering, and medical expenses, nor would it have authority to award punitive damages. The court refused to give a requested instruction to the effect that the jury could not consider any evidence regarding discrimination with respect to employment opportunities or hiring procedures.

The jury returned a verdict of $7,500 actual damages and $175,000 punitive damages against the Union, the District Council, and Business Agent Daley, and the trial court entered a judgment on the verdict.[4]

The California Court of Appeal reversed. 49 Cal. App. 3d 614, 122 Cal. Rptr. 722. Relying on this Court's decisions in *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274 (1971); *Plumbers* v. *Borden,* 373 U. S. 690 (1963); *Iron Workers* v. *Perko,* 373 U. S. 701 (1963); and *San Diego Bldg. Trades Council* v. *Garmon,* 359 U. S. 236 (1959), the Court of

---

[4] Hill voluntarily dismissed the complaint against the International and one Union official, the trial court dismissed the complaint with respect to another Union official, and the jury entered a verdict in favor of two other Union officials.

Appeal held that the state courts had no jurisdiction over the complaint since the "crux" of the action concerned employment relations and involved conduct arguably subject to the jurisdiction of the National Labor Relations Board. The court remanded "with instructions to render judgment for the defendants and dismiss the action." 49 Cal. App. 3d, at 631, 122 Cal. Rptr., at 732. The California Supreme Court denied review.

We granted certiorari to consider the applicability of the pre-emption doctrine to cases of this nature, 423 U. S. 1086 (1976). For the reasons set forth below we vacate the judgment of the Court of Appeal and remand for further proceedings.

## II

The doctrine of pre-emption in labor law has been shaped primarily by two competing interests.[5] On the one hand, this Court has recognized that "the broad powers conferred by Congress upon the National Labor Relations Board to interpret and to enforce the complex Labor Management Relations Act . . . necessarily imply that potentially conflicting 'rules of law, of remedy, and of administration' cannot be permitted to operate." *Vaca* v. *Sipes,* 386 U. S. 171, 178–179 (1967), quoting *San Diego Bldg. Trades Council* v. *Garmon, supra,* at 242. On the other hand, because Congress has refrained from providing specific directions with respect to the scope of pre-empted state regulation, the Court has been unwilling to "declare pre-empted all local regulation that touches or con-

---

[5] "[I]n referring to decisions holding state laws pre-empted by the NLRA, care must be taken to distinguish pre-emption based on federal protection of the conduct in question . . . from that based predominantly on the primary jurisdiction of the National Labor Relations Board . . . , although the two are often not easily separable." *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 383 n. 19 (1969). The branch of the pre-emption doctrine most applicable to the instant case concerns the primary jurisdiction of the National Labor Relations Board.

cerns in any way the complex interrelationships between employees, employers, and unions . . . ." *Motor Coach Employees* v. *Lockridge, supra,* at 289. Judicial experience with numerous approaches to the pre-emption problem in the labor law area eventually led to the general rule set forth in *Garmon, supra,* at 244, and recently reaffirmed in both *Lockridge, supra,* at 291, and *Machinists* v. *Wisconsin Emp. Rel. Comm'n,* 427 U. S. 132, 138–139 (1976):

> "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress, and requirements imposed by state law." 359 U. S., at 244.[6]

But the same considerations that underlie the *Garmon* rule have led the Court to recognize exceptions in appropriate classes of cases.[7] We have refused to apply the pre-emption doctrine to activity that otherwise would fall within the scope of *Garmon* if that activity "was a merely peripheral concern of the Labor Management Relations Act . . . [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction,

---

[6] The history of the *Garmon* doctrine was recently summarized in *Motor Coach Employees* v. *Lockridge,* 403 U. S., at 290–291, and in *Machinists* v. *Wisconsin Emp. Rel. Comm'n,* 427 U. S., at 138–139.

[7] "[W]e [cannot] proceed on a case-by-case basis to determine whether each particular final judicial pronouncement does, or might reasonably be thought to, conflict in some relevant manner with federal labor policy. This Court is ill-equipped to play such a role and the federal system dictates that this problem be solved with a rule capable of relatively easy application, so that lower courts may largely police themselves in this regard." *Motor Coach Employees* v. *Lockridge, supra,* at 289–290.

we could not infer that Congress had deprived the States of the power to act." *Id.*, at 243–244. See, *e. g.*, *Linn* v. *Plant Guard Workers*, 383 U. S. 53 (1966) (malicious libel); *Automobile Workers* v. *Russell*, 356 U. S. 634 (1958) (mass picketing and threats of violence); *Machinists* v. *Gonzales*, 356 U. S. 617 (1958) (wrongful expulsion from union membership). We also have refused to apply the pre-emption doctrine "where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes." *Motor Coach Employees* v. *Lockridge*, *supra*, at 297–298. See *Vaca* v. *Sipes*, *supra* (duty of fair representation cases).[8]

These exceptions "in no way undermine the vitality of the pre-emption rule." 386 U. S., at 180. To the contrary, they highlight our responsibility in a case of this kind to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme.

---

[8] In addition to the judicially developed exceptions referred to in the text, Congress itself has created exceptions to the Board's exclusive jurisdiction in other classes of cases. Section 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as amended, 29 U. S. C. § 187, authorizes anyone injured in his business or property by activity violative of § 8 (b) (4) of the NLRA, 61 Stat. 140, as amended, 29 U. S. C. § 158 (b) (4), to recover damages in federal district court even though the underlying unfair labor practices are remediable by the Board. See *Teamsters* v. *Morton*, 377 U. S. 252 (1964). Section 301 of the LMRA, 29 U. S. C. § 185, authorizes suits for breach of a collective-bargaining agreement even if the breach is an unfair labor practice within the Board's jurisdiction. See *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962). Section 14 (c) (2) of the NLRA, as added by Title VII, § 701 (a) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 541, 29 U. S. C. § 164 (c) (2), permits state agencies and state courts to assert jurisdiction over "labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction."

The nature of the inquiry is perhaps best illustrated by *Linn* v. *Plant Guard Workers, supra.* Linn, an assistant manager of Pinkerton's National Detective Agency, filed a diversity action in federal court against a union, two of its officers, and a Pinkerton employee, alleging that the defendants had circulated a defamatory statement about him in violation of state law. If unfair labor practice charges had been filed, the Board might have found that the union violated § 8 by intentionally circulating false statements during an organizational campaign, or that the issuance of the malicious statements during the campaign had such a significant effect as to require that the election be set aside. Under a formalistic application of *Garmon,* the libel suit could have been pre-empted.

But a number of factors influenced the Court to depart from the *Garmon* rule. First, the Court noted that the underlying conduct—the intentional circulation of defamatory material known to be false—was not protected under the Act, 383 U. S., at 61, and there was thus no risk that permitting the state cause of action to proceed would result in state regulation of conduct that Congress intended to protect. Second, the Court recognized that there was " 'an overriding state interest' " in protecting residents from malicious libels, and that this state interest was " 'deeply rooted in local feeling and responsibility.' " *Id.,* at 61, 62. Third, the Court reasoned that there was little risk that the state cause of action would interfere with the effective administration of national labor policy. The Board's § 8 unfair labor practice proceeding would focus only on whether the statements were misleading or coercive; whether the statements also were defamatory would be of no relevance to the Board's performance of its functions. *Id.,* at 63. Moreover, the Board would lack authority to provide the defamed individual with damages or other relief. *Ibid.* Conversely, the state-law action would be unconcerned with whether the statements were coercive or

misleading in the labor context, and in any event the court would have power to award Linn relief only if the statements were defamatory. Taken together, these factors justified an exception to the pre-emption rule.

The Court was careful, however, to limit the scope of that exception. To minimize the possibility that state libel suits would either dampen the free discussion characteristic of labor disputes or become a weapon of economic coercion, the Court adopted by analogy the standards enunciated in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and held that state damages actions in this context would escape pre-emption only if limited to defamatory statements published with knowledge or reckless disregard of their falsity. The Court also held that a complainant could recover damages only upon proof that the statements had caused him injury, including general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or any other form of harm recognized by state tort law. The Court stressed the responsibility of the trial judge to assure that damages were not excessive.

Similar reasoning underlies the exception to the pre-emption rule in cases involving violent tortious activity. Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute, *Automobile Workers* v. *Russell,* 356 U. S., at 640; *id.,* at 649 (Warren, C. J., dissenting); *Construction Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656, 666 (1954), and thus there is no risk that state damages actions will fetter the exercise of rights protected by the NLRA. On the other hand, our cases consistently have recognized the historic state interest in "such traditionally local matters as public safety and order and the use of streets and highways." *Allen-Bradley Local* v. *Wisconsin Emp. Rel. Bd.,* 315 U. S. 740, 749 (1942). And, as with the defamation actions preserved by *Linn,* state-court actions to redress injuries caused by violence or threats

of violence are consistent with effective administration of the federal scheme: Such actions can be adjudicated without regard to the merits of the underlying labor controversy. *Automobile Workers* v. *Russell, supra,* at 649 (Warren, C. J., dissenting).

Although cases like *Linn* and *Russell* involve state-law principles with only incidental application to conduct occurring in the course of a labor dispute, it is well settled that the general applicability of a state cause of action is not sufficient to exempt it from pre-emption. "[I]t [has not] mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations." [9] *Garmon,* 359 U. S., at 244. Instead, the cases reflect a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation. As was said in *Vaca* v. *Sipes,* 386 U. S., at 180, our cases "demonstrate that the decision to pre-empt federal and state court jurisdiction over

---

[9] In *Plumbers* v. *Borden,* 373 U. S. 690 (1963), for example, an employee sued his union, which operated a hiring hall, claiming that the union had arbitrarily refused to refer him for employment on one particular occasion. He alleged that the union's conduct constituted both tortious interference with his right to contract for employment and breach of a promise, implicit in his membership arrangement with the union, not to discriminate unfairly against any member or deny him the right to work. Under these circumstances, concurrent state-court jurisdiction would have impaired significantly the functioning of the federal system. If unfair labor practice charges had been filed, the Board might have concluded that the refusal to refer Borden was due to a lawful hiring hall practice, see *Teamsters* v. *NLRB,* 365 U. S. 667 (1961). Board approval of various hiring hall practices would be meaningless if state courts could declare those procedures violative of the contractual rights implicit between a member and his union. Accordingly, the state cause of action was pre-empted under *Garmon.* Similar reasoning prompted the Court to apply the *Garmon* rule in the companion case of *Iron Workers* v. *Perko,* 373 U. S. 701 (1963).

a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." [10]

## III

In count two of his amended complaint, see *supra,* at 293, Hill alleged that the defendants had intentionally engaged in "outrageous conduct, threats, intimidation, and words" which caused Hill to suffer "grievous mental and emotional distress as well as great physical damage." In the context of Hill's other allegations of discrimination in hiring hall

---

[10] *Machinists* v. *Gonzales,* 356 U. S. 617 (1958), established another exception to the general rule of pre-emption for state-law actions alleging expulsion from union membership in violation of the applicable union constitution and bylaws and seeking restoration to membership and damages due to the illegal expulsion. *Gonzales* was decided prior to this Court's adoption in *Garmon* of the current pre-emption test, and our decision in *Lockridge* makes it clear that "the full-blown rationale of *Gonzales* could not survive the rule of *Garmon." Lockridge,* 403 U. S., at 295. At the same time, we stated that *"Garmon* did not cast doubt upon the result reached in *Gonzales," id.,* at 295, since *Garmon* cited *Gonzales* as an example of the nonapplicability of the normal pre-emption rule "where the activity regulated was a merely peripheral concern of the . . . Act." 359 U. S., at 243.

Although the *Lockridge* decision has been the subject of extensive criticism, see, *e. g.,* Bryson, A Matter of Wooden Logic: Labor Law Pre-emption and Individual Rights, 51 Texas L. Rev. 1037, 1050–1058 (1973); Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1368–1377 (1972), the instant case presents no occasion for us to reconsider the relationship between *Lockridge* and *Gonzales.* Whatever the scope of *Gonzales* after *Garmon* and *Lockridge,* the analysis used by the Court in those cases is consistent with the framework discussed in the text above. *Lockridge* held that the state-court action at issue involved a "real and immediate" potential for conflict with the federal scheme, 403 U. S., at 296, whereas the possibility that the state court in *Gonzales* "would directly and consciously implicate principles of federal law" was considered "at best tangential and remote." *Ibid.*

referrals, these allegations of tortious conduct might form the basis for unfair labor practice charges before the Board. On this basis a rigid application of the *Garmon* doctrine might support the conclusion of the California courts that Hill's entire action was pre-empted by federal law. Our cases indicate, however, that inflexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme. With respect to Hill's claims of intentional infliction of emotional distress, we cannot conclude that Congress intended exclusive jurisdiction to lie in the Board.

No provision of the National Labor Relations Act protects the "outrageous conduct" complained of by petitioner Hill in the second count of the complaint. Regardless of whether the operation of the hiring hall was lawful or unlawful under federal statutes, there is no federal protection for conduct on the part of union officers which is so outrageous that "no reasonable man in a civilized society should be expected to endure it." See *supra,* at 294. Thus, as in *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966), and *Automobile Workers* v. *Russell, supra,* permitting the exercise of state jurisdiction over such complaints does not result in state regulation of federally protected conduct.

The State, on the other hand, has a substantial interest in protecting its citizens from the kind of abuse of which Hill complained. That interest is no less worthy of recognition because it concerns protection from emotional distress caused by outrageous conduct, rather than protection from physical injury, as in *Russell,* or damage to reputation, as in *Linn.* Although recognition of the tort of intentional infliction of emotional distress is a comparatively recent development in state law, see W. Prosser, Law of Torts, § 12, pp. 49–50, 56 (4th ed. 1971), our decisions permitting the exercise of

state jurisdiction in tort actions based on violence or defamation have not rested on the history of the tort at issue, but rather on the nature of the State's interest in protecting the health and well-being of its citizens.

There is, to be sure, some risk that the state cause of action for infliction of emotional distress will touch on an area of primary federal concern. Hill's complaint itself highlights this risk. In those counts of the complaint that the trial court dismissed, Hill alleged discrimination against him in hiring hall referrals, which were also alleged to be violations of both the collective-bargaining agreement and the membership contract. These allegations, if sufficiently supported before the National Labor Relations Board, would make out an unfair labor practice [11] and the Superior Court considered them pre-empted by the federal Act.[12] Even in count two of

---

[11] Discrimination in hiring hall referrals constitutes an unfair labor practice under §§ 8 (b)(1)(A) and 8 (b)(2) of the NLRA. See, e. g., Radio Officers v. NLRB, 347 U. S. 17 (1954); Operating Engineers Local 18, 205 N. L. R. B. 901 (1973), enf'd, 500 F. 2d 48 (CA6 1974).

Prior to the filing of this suit, Hill filed an unfair labor practice charge with the Board with respect to one specific instance of alleged discrimination. He alleged that the Union violated §§ 8 (b)(1)(A) and 8 (b)(2) by refusing to honor an employer's request that he be referred for employment on a particular construction job. The Board awarded Hill $2,517 in backpay.

[12] Whether a hiring hall practice is discriminatory and therefore violative of federal law is a determination Congress has entrusted to the Board. See Teamsters v. NLRB, 365 U. S. 667 (1961). Whether there is federal pre-emption with respect to allegations of breach of a contractual obligation depends upon the nature of the obligation and the alleged breach. See Motor Coach Employees v. Lockridge, 403 U. S., at 292–297, 298–301. Casting a complaint in terms of breach of a membership agreement does not necessarily insulate a state-court action from application of the pre-emption doctrine. See n. 9, supra. Allegations of breach of the contract between the union and the employer stand on different ground, since, as noted earlier, § 301 of the Labor Management Relations Act, 29 U. S. C. § 185, authorizes suits for breach of a collective-bargaining

the complaint Hill made allegations of discrimination in "job-dispatching procedures" and "work assignments" which, standing alone, might well be pre-empted as the exclusive concern of the Board. The occurrence of the abusive conduct, with which the state tort action is concerned, in such a context of federally prohibited discrimination suggests a potential for interference with the federal scheme of regulation.

Viewed, however, in light of the discrete concerns of the federal scheme and the state tort law, that potential for interference is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens. If the charges in Hill's complaint were filed with the Board, the focus of any unfair labor practice proceeding would be on whether the statements or conduct on the part of Union officials discriminated or threatened discrimination against him in employment referrals for reasons other than failure to pay Union dues. See n. 11, *supra*. Whether the statements or conduct of the respondents also caused Hill severe emotional distress and physical injury would play no role in the Board's disposition of the case, and the Board could not award Hill damages for pain, suffering, or medical expenses. Conversely, the state-court tort action can be adjudicated without resolution of the "merits" of the underlying labor dispute. Recovery for the tort of emotional distress under California law requires proof that the defendant intentionally engaged in outrageous conduct causing the plaintiff to sustain mental distress. *State Rubbish Collectors Assn.* v. *Siliznoff*, 38 Cal. 2d 330, 240 P. 2d 282 (1952); *Alcorn* v. *Anbro Engineering, Inc.*, 2 Cal. 3d 493, 468 P. 2d 216 (1970). The state court need not consider, much less resolve, whether a union discriminated or threatened to discriminate against an employee in terms of employment opportunities. To the

---

*agreement* even if the breach is an unfair labor practice within the Board's jurisdiction. See n. 8, *supra*.

contrary, the tort action can be resolved without reference to any accommodation of the special interests of unions and members in the hiring hall context.

On balance, we cannot conclude that Congress intended to oust state-court jurisdiction over actions for tortious activity such as that alleged in this case. At the same time, we reiterate that concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme. Union discrimination in employment opportunities cannot itself form the underlying "outrageous" conduct on which the state-court tort action is based; to hold otherwise would undermine the pre-emption principle. Nor can threats of such discrimination suffice to sustain state-court jurisdiction. It may well be that the threat, or actuality, of employment discrimination will cause a union member considerable emotional distress and anxiety. But something more is required before concurrent state-court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either unrelated to employment discrimination or a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.[13]

Two further limitations deserve emphasis. Our decision rests in part on our understanding that California law permits recovery only for emotional distress sustained as a result of "outrageous" conduct. The potential for undue in-

---

[13] In view of the potential for interference with the federal scheme of regulation, the trial court should be sensitive to the need to minimize the jury's exposure to evidence of employment discrimination in cases of this sort. Where evidence of discrimination is necessary to establish the context in which the state claim arose, the trial court should instruct the jury that the fact of employment discrimination (as distinguished from attendant tortious conduct under state law) should not enter into the determination of liability or damages.

terference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts. We also repeat that state trial courts have the responsibility in cases of this kind to assure that the damages awarded are not excessive. See *Linn* v. *Plant Guard Workers,* 383 U. S., at 65–66.

## IV

Although the second count of petitioner's complaint alleged the intentional infliction of emotional distress, it is clear from the record that the trial of that claim was not in accord with the standards discussed above. The evidence supporting the verdict in Hill's favor focuses less on the alleged campaign of harassment, public ridicule, and verbal abuse, than on the discriminatory refusal to dispatch him to any but the briefest and least desirable jobs; [14] and no appropriate instruction distinguishing the two categories of evidence was given to the jury. See n. 13, *supra.* The consequent risk that the jury verdict represented damages for employment discrimination rather than for instances of intentional

---

[14] Almost the entire section of petitioner's brief summarizing the trial transcript, see Brief for Petitioner 4–10, is directed at instances of Union discrimination against Hill with respect to employment opportunities. Moreover, counsel for petitioner, who was also petitioner's trial counsel, indicated at oral argument that the focus of the trial was on employment discrimination rather than the intentional infliction of emotional distress: "We had to show simply two easy issues to the jury: one, what the [hiring hall] rules were; and two, were they fairly applied." Tr. of Oral Arg. 69. It is plain that those two elements are more relevant to the issue of discriminatory referrals than to the issue of infliction of emotional distress.

Respondents concede that "[t]he allegations made in the plaintiff's second cause of action . . . sound in the state tort law of intentional infliction of emotional distress," but contend that the dominant focus of the evidence adduced at trial was on discriminatory hiring hall referrals. Brief for Respondents 28.

.

infliction of emotional distress precludes reinstatement of the judgment of the Superior Court.

The judgment of the Court of Appeal is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.[15]

*It is so ordered.*

---

[15] We, of course, express no view on the question whether those aspects of the case that are not pre-empted are sufficient under state law to amount to conduct "that no reasonable man in a civilized society should be expected to endure."